UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| R.R.M.C., Petitioner, -v- TODD BLANCHE, Respondent. | 26-MC-114 (JMF) OPINION AND ORDER |

JESSE M. FURMAN, United States District Judge and Special Master:

Petitioner R.R.M.C., a native and citizen of Honduras, is currently challenging an order of removal, by way of a petition for review, in the United States Court of Appeals for the Second Circuit. *See* RX-05 ("BIA Decision"), at 1; RX-09, at 1.[1] On November 14, 2025, the Second Circuit entered an order granting Petitioner a temporary stay of removal pending a decision on his petition for review. *See* RX-10; ECF No. 1 ("App't Order"), at 1. Petitioner claims that, on January 26, 2026, the Government violated that stay order by flying him from Louisiana to Honduras — only to fly him back again the same day. *See* App't Order 1; PX-01 ("Pet'r's Decl."), ¶¶ 1, 7-14. The Government denies his claim. *See* App't Order 1; RX-14, ¶¶ 11-12.

The Second Circuit tried to get to the bottom of whether Petitioner was removed in violation of its order but, despite its best efforts, was ultimately unable to "conclusively resolve" the parties' factual disputes, in part because the Government failed, despite multiple opportunities, to produce "any sworn declarations from any official with personal knowledge of

[1] "RX" refers to one of Respondent's hearing exhibits; "PX" refers to one of Petitioner's hearing exhibits; "Tr." refers to the transcript of the evidentiary hearing held on September 22, 2026; and "[Name] Dep. Tr." refers to the transcript of the named witness's deposition.

Petitioner's location throughout January 26, 2026." App't Order 1. Accordingly, by Order entered on March 13, 2026, the Circuit appointed me as Special Master pursuant to Rule 48(a) of the Federal Rules of Appellate Procedure. *See id.* at 1-2. The Circuit tasked me with conducting further proceedings and recommending findings of fact regarding two questions: "(1) whether Petitioner was flown to and from Honduras on January 26, 2026 as he has alleged; and (2) whether any counsel, party, or declarant has made a knowing and material misrepresentation to the Court in connection with this allegation." *Id.* at 2.

The parties and I decided to "focus in the first instance on" the first question — namely, whether Petitioner was flown to and from Honduras on January 26, 2026. ECF No. 10, at 2; *see* ECF No. 150 ("JPTO"), at 2. On September 22, 2026, after approximately six months of discovery, I held a one-day evidentiary hearing at which Petitioner and five other witnesses testified live. *See generally* ECF No. 159 ("Tr."). The record also includes deposition transcripts, *see, e.g.*, JPTO 6-8; ECF No. 145-1, stipulations between the parties, *see* JPTO 3-5 ("Stipulations"), and dozens of exhibits, *see* ECF Nos. 145-2, 145-3. The parties submitted written summations one week after the hearing was held. *See* ECF No. 154 ("Pet'r's Summation"); ECF No. 155 ("Gov't's Summation").

The parties dispute who bears the burden of proof in this unusual posture. Petitioner argues, not without force, that the burden should be on the Government because it had custody of him at all relevant times and controls every record bearing on his whereabouts. *See* Pet'r's Summation 1-2. By contrast, the Government implies, also not without force, that the burden should be on Petitioner to back up his allegations. *See* Gov't's Summation 1. I need not and do not resolve the question of who bears the burden of proof because my recommended findings of

fact would be the same in either event. In brief, and as explained below, I conclude that it is more likely than not that R.R.M.C. was *not* flown to Honduras on January 26, 2026.

## DISCUSSION

### A. Facts Not in Dispute

I begin with facts that are not in dispute. First, this is not Petitioner's first brush with a potentially wrongful removal. In 2023, the Government "accidental[ly]" removed him to Honduras. BIA Decision 4. In September 2023, Petitioner filed a lawsuit against the Government relating to that removal, seeking, among other things, an order directing his return to the United States. *See R.R.M.C. v. DHS*, No. 23-CV-7946 (JGLC), ECF No. 5, at 22 (S.D.N.Y. Sept. 8, 2023); *id.*, ECF No. 72 ("2023 Case Dismissal Stip."), at 1-2 (S.D.N.Y. July 23, 2026). In or about 2025, he also filed a claim against the Government for $10 million in damages, apparently under the Federal Tort Claims Act. *See* Tr. 104; RX-66, at 7 (reflecting an email chain between Petitioner's counsel and the Government with the subject line "R.R.M.C. FTCA Claim" in which Petitioner's counsel refers to "the FTCA claim that was filed with ICE on August 21, 2025 . . . in the amount of $10,000,000"); *see also* 2023 Case Dismissal Stip. 7 (releasing "any claim under the Federal Tort Claims Act"). In January 2025, pursuant to an agreement between the parties in the lawsuit, the Government returned Petitioner to the United States and detained him. *See* 2023 Case Dismissal Stip. 2-3. In January 2026, the litigation was still ongoing, with the parties discussing a potential settlement. *See id.* at 3; *R.R.M.C. v. DHS*, No. 23-CV-7946 (JGLC), ECF No. 53, at 2 (S.D.N.Y. Jan. 30, 2026).

In January 2026, Petitioner was detained at Winn Correctional Center ("Winn"), which is located in Winnfield, Louisiana. RX-15, ¶ 3. On January 22, 2026, notwithstanding the Second Circuit's order staying Petitioner's removal, Immigration and Customs Enforcement ("ICE") put

Petitioner on a list of detainees to be removed four days later. RX-52; *see* RX-14, ¶ 4; RX-12, ¶ 4. On January 25, 2026, an ICE officer signed an order directing Winn to release Petitioner, along with twenty-seven other detained Honduran nationals, for removal the next morning. RX-25, at GOV-269, GOV-272. That same evening, corrections officers approached Petitioner in his housing unit at Winn with a list that included his name, and they told him to prepare for transport to the airport in Alexandria, Louisiana. Tr. 30, 54. Petitioner then checked his commissary account and discovered that it had been locked, which he took to mean he was about to be transferred or removed. Tr. 54-55, 59. He therefore contacted his close friend Ambien Mitchell and asked her to alert his immigration lawyers. Tr. 59; Pet'r's Decl. ¶ 3. At 12:28 a.m. on January 26, 2026, Julia Kerr of the Legal Aid Society, one of Petitioner's immigration lawyers, emailed a dozen or so ICE employees. RX-16, at GOV-12; *see* PX-16, at 2. She alerted them that Petitioner's commissary account "has again been locked," and she asked someone to "confirm that he is being transferred and not being removed." RX-16, at GOV-12.

Shortly after midnight on January 26, 2026, Petitioner was taken from his unit to Winn's booking area, where he was placed in restraints and loaded onto Bus BB269047, sometimes referred to as "Bus 47." *See* Tr. 31-32, 59-60; RX-29, at GOV-715-716; RX-46, at GOV-1033-34. At 2:55 a.m., Bus 47 departed Winn with another bus, Bus BB269050, sometimes referred to as "Bus 50" and other times "Bus 53." RX-46, at GOV-1033; RX-42, at GOV-1022; RX-43, at GOV-1025; RX-45, GOV-1030; RX-47; *see* Matt Mathews Dep. Tr. 49-52; Narvin Powell, Jr. Dep. Tr. 35-36; RX-37. Bus 47, operated by transportation officers Matt Mathews and LaShonda Sapp, carried thirty-two detainees, including Petitioner and another detainee relevant here, Santiago de Jesus Gutierres-Amador. RX-29, at GOV-715-16; RX-43, at GOV-1025; RX-46, at GOV-1033-34; *see* Sapp Dep. Tr. 28-29. Bus 50, operated by transportation officers

Narvin Powell, Jr. and Tiffani Martin, carried twenty-five Guatemalan detainees, including one other detainee relevant here, Santos Rosales-Ortiz. RX-42, at GOV-1022; RX-45, at GOV-1030-32; *see* Powell Dep. Tr. 34-36; Martin Dep. Tr. 26-28. At about 4:30 a.m., both buses reached the Alexandria Staging Facility ("ASF"). *See* RX-12, ¶ 7; RX-37; RX-41, at GOV-1020; RX-42, at GOV-1022; RX-43, at GOV-1025; RX-47. ASF was not open at that hour, so the buses waited outside the gates. Tr. 43-44, 60.

At or about 7:48 a.m., the buses were permitted to enter ASF. RX-37; RX-47. That day, there was only one flight from ASF to Honduras and one flight back. Stipulations ¶¶ c-d. At or about 9:13 a.m., the outbound flight — with flight identification GXA6126 — was in the process of being loaded with detainees. *Id.* ¶ e; *see* RX-38, at GOV-1007. By about 9:41 a.m., all detainees had been loaded aboard the flight, which then departed ASF at or about 10:29 a.m. Stipulations ¶ g; *see* RX-38, at GOV-1007. The plane returned the same day, with flight identification GXA6127, landing back at ASF at or about 5:16 p.m. Stipulations ¶¶ f, h.

**B. From There, the Parties' Versions of Events Diverge**

The two sides offer vastly different accounts of what occurred after ASF's gates opened. According to Petitioner, an ICE officer boarded Bus 47, called his name, and escorted him to an area on the tarmac near the plane. Tr. 32, 61. After being searched, Petitioner claims, he boarded the plane and flew from Alexandria to Honduras. Tr. 32-33, 61; ECF No. 147 ("Pet'r's PFOF"), ¶¶ 9-13. Once there, he says, every other detainee was allowed off the plane except for him. Tr. 34; Pet'r's PFOF ¶ 14. He claims that an officer showed him a list with his name crossed out in red and told him, in substance, that Honduras would not accept him because he was not Honduran; that remained the case even after Petitioner provided the officer with his Honduran identification number. Tr. 34-35, 79-80; Pet'r's PFOF ¶¶ 15-16. On his telling, the

Government then flew him back to Alexandria on the same aircraft, moved him from one bus to another, held him on the second bus while awaiting a group of detainees who were arriving from Texas, and then returned him to Winn late that evening. Tr. 35-37; Pet'r's PFOF ¶¶ 17-21.

For its part, the Government denies that Petitioner ever boarded the aircraft to Honduras. *See* ECF No. 146 ("Gov't's PFOF"), ¶¶ 35-63; Gov't's Summation 1. On its account, ICE officers cut Petitioner from the removal mission before any detainees were brought onto the plane and then walked him from Bus 47 to Bus 50 (also known as Bus 53), where Rosales-Ortiz — who had been cut from a removal mission to Guatemala — was already waiting. Gov't's PFOF ¶¶ 39-46. On the Government's timeline, Petitioner and Rosales-Ortiz were soon joined by Gutierres-Amador, who was removed from the Honduras flight after being brought onto the plane. *Id.* ¶¶ 47-48. The Government asserts that all three men were then returned to Winn by early evening on the same day, January 26, 2026. *Id.* ¶¶ 57-63.

Both sides agree that, a couple days later, ICE officers visited Petitioner at Winn and photographed him, but they disagree on what was said during the interaction. *See* Stipulations ¶ i (stipulating that GOV-47 is a photograph of Petitioner taken on January 28, 2026); ECF No. 145-3, at 2 (identifying GOV-47 as RX-19); RX-19; Tr. 50-51, 97 (Petitioner's hearing testimony); RX-02 (officer interrogatory negating Petitioner's account); RX-03 (same); RX-04 (same); *but see* RX-64 ("Pet'r's Dep. Part II"), at 6 (Petitioner testifying at his deposition that the visit took place on January 30, 2026); Tr. 97 (Petitioner confirming, on cross-examination, that he had testified at his deposition that the visit took place on January 30, 2026). Petitioner claims that, during the visit, the officers apologized for having flown him to Honduras and that one officer opined that his coworkers had "fucked up." Tr. 37, 50-51; Pet'r's PFOF ¶ 22. The officers deny acknowledging that Petitioner was flown to Honduras, let alone apologizing. *See*

RX-02; RX-03; RX-04; Gov't's PFOF ¶ 65. A video of the encounter is in the record, but it lacks any audio. RX-50; RX-51.

### C. The Record Shows That Petitioner Was Not Removed to Honduras on January 26, 2026

Based on the full record, including an assessment of the credibility of the witnesses who testified during the evidentiary hearing, I conclude that the preponderance of evidence supports the Government's version of events and that Petitioner was not flown to Honduras on January 26, 2026. That conclusion is based principally on the testimony of Gutierres-Amador and Rosales-Ortiz, two other detainees who were taken to and from ASF on January 26, 2026; the testimony of those who participated in the removal mission; and contemporaneous records.

#### 1. The Testimony of Gutierres-Amador and Rosales-Ortiz

First, the testimony of Gutierres-Amador and Rosales-Ortiz supports the conclusion that Petitioner did not fly to and from Honduras on January 26, 2026, but rather returned from ASF on Bus 50 (also known as Bus 53). Specifically, both witnesses described spending hours on the bus with a tall or thin, dark-skinned Honduran man with long hair. Tr. 9-10, 18, 161-62, 163. Both identified Petitioner by photograph as that man. *Id.* at 12, 164; *see* Stipulations ¶¶ i-j (stipulating that GOV-47, which was admitted as RX-19, is a fair and accurate photograph of Petitioner taken on January 28, 2026); Tr. 172 (Petitioner's counsel stipulating that RX-19 was the photograph that was shown to Rosales-Ortiz at his deposition). And Gutierres-Amador (who, unlike Rosales-Ortiz, testified live in court rather than remotely by video) also identified Petitioner in the courtroom as the man he saw on the bus. Tr. 12-13.

Based on an assessment of the witnesses' demeanor, not to mention the totality of the corroborating evidence discussed below, I credit the core of Gutierres-Amador's and Rosales-Ortiz's testimony — to wit, that Petitioner returned with them by bus to Winn and, thus, did not

fly to (and from) Honduras. Their testimony on that front is consistent. As is their testimony on other details of the events of that day. For instance, both men testified that their bus stopped to get gas on the way back to Winn and that the male driver got off the bus when it stopped. Tr. 19, 163. Both men testified that they were given a sandwich and water while on the bus. *Id.* at 19-20, 165. Both men testified that the bus arrived back at Winn at approximately 6:20 p.m. *Id.* at 11, 163. And each man described the third detainee on the bus in ways that correspond with the other. *Id.* at 9-10, 164-65.

To be sure, there are reasons to hesitate before putting too much weight on the testimony of Gutierres-Amador or Rosales-Ortiz. For one, there were discrepancies in their testimony — most notably, with respect to the boarding of the bus. Gutierres-Amador testified that, when he entered the bus, Guatemalan detainees were on board, but they left shortly afterward, *id.* at 8-9, 17-18, while Rosales-Ortiz testified that Petitioner and the third detainee (presumably, Gutierres-Amador) arrived together after the Guatemalans had left, *id.* at 169-71. Additionally, Gutierres-Amador estimated that he was on the second bus from about 11 a.m. until early evening, *id.* at 10, while Rosales-Ortiz estimated that the other two detainees joined him around 1 p.m., *id.* at 167. These discrepancies could perhaps be explained by the passage of time since the events at issue, not to mention the fact that the two men were left restrained on a bus for hours without watches after being awake for a full day. *Id.* at 24, 166-67. But they do provide some pause.

Additionally, both Gutierres-Amador and Rosales-Ortiz unquestionably had motives to curry favor with the Government. Rosales-Ortiz is currently detained and appealing an order of removal, and he acknowledged that the Government holds "absolute control" over his ability to remain in this country. *Id.* at 159-60, 168-69. And while Gutierres-Amador is free, having obtained resident status in April 2026 (notably, *before* the Government first approached him in

connection with this matter, *id.* at 14; Gutierres-Amador Dep. Tr. 36-38, 44), he is not a citizen, and he too acknowledged the Government holds "absolute control" over his future. Tr. 25. Moreover, his wife has her own immigration case pending. *Id.* at 24-25, 28; Gutierres-Amador Dep. Tr. 43. At the same time, both men testified that no one had promised or offered them anything for their testimony; that no one had threatened them or forced them to testify; and that, when they identified Petitioner, they did not even know what the issue in this case was. Tr. 21-22, 27-28, 171-72; *see also* Rosales-Ortiz Dep. Tr. 50 (asking, after identifying Petitioner's photograph, whether he was "in big trouble" and stating, "I don't know what really is going on here"). This too, though, provides reason to hesitate before putting too much weight on either man's testimony.

Indeed, were there no independent evidence corroborating Gutierres-Amador and Rosales-Ortiz, perhaps these reasons for doubt would be enough to persuade me not to rely on their testimony — or at least not to rely on it enough to find, by a preponderance, that Petitioner was not on the flight to Honduras. But their testimony *is* corroborated by a host of other evidence, including contemporaneous records regarding the removal operation. That other evidence, in conjunction with an assessment of Gutierres-Amador's and Rosales-Ortiz's demeanor and the consistencies in the core of their testimony, is enough to persuade me that they were telling the truth when they testified that Petitioner was on their bus, not on the plane.

To the other evidence, then, I turn.

**2. Evidence Concerning the Cutting of Petitioner from the Flight**

First, contemporaneous records — including emails, telephone records, and other documents — and related testimony support the conclusion that Petitioner was stricken from the removal mission and not put on the flight to Honduras. At 7:48 a.m. on January 26, 2026,

Supervisory Detention and Deportation Officer ("SDDO") Christopher Rabe emailed Justin Williams, then the SDDO responsible for the Winn docket and now an Acting Assistant Field Office Director, forwarding attorney Julia Kerr's earlier inquiries about Petitioner's status. RX-16, at GOV-11; Tr. 144; RX-14, ¶ 1; Williams Dep. Tr. 15. At 8:10 a.m., Williams called SDDO Ronnie Downey, the supervisor on duty at ASF. RX-49; PX-15; Tr. 143, 144, 145-46; Williams Dep. Tr. 38. During this call, Williams "instructed SDDO [Ronnie] Downey to cut Petitioner from the removal mission." PX-15; *see* Tr. 145.

At 8:13 a.m., Downey placed a one-minute call to Deportation Officer Christopher Robinson, the officer in charge of the bus that brought Petitioner to ASF from Winn. Tr. 146-47, 155; RX-49. At the hearing, Downey testified credibly that he told Robinson "there is an individual on a Winn correctional bus that needs to be cut" and that Robinson, in sum and substance, answered: "Okay. I will make sure he's cut." *Id.* at 153-54. Robinson then executed the directive by drawing a red line through Petitioner's name on the Form I-216 manifest. RX-01; RX-27; RX-13, ¶¶ 5-7; Robinson Dep. Tr. 30-31, 151-52. Significantly, Robinson swore that he took this step "prior to boarding any detainees onto the plane," RX-01; *see* RX-13, ¶ 5, although he acknowledged at his deposition that that statement rests on his routine practice rather than on a specific memory of January 26, 2026, Robinson Dep. Tr. 32-33, 108-09.

At 8:16 a.m., Williams sent an email to "ASF Movements" and "ASF-SUPERVISORS," copying various other ICE officials, with the following directive and a reference to Petitioner: "Please cut the following detainee from the removal mission. He has a stay and the case and a [petition for removal] from the 2nd circuit. Case is bannered correctly in EARM and he should not have been scheduled." RX-17; RX-18, at GOV-46; Tr. 144-45.[2] At 8:27 a.m., Downey

2 "EARM" is the ENFORCE Alien Removal Module, a Government database.

responded to the email with an email of his own, stating: "He has been cut." RX-18, at GOV-45; Tr. 147-48. That, in turn, prompted Williams, five minutes later, to reply: "Thank you sir. . . . you just saved us a suit. . . . this would have been the second time he was inadvertently removed[.]" RX-22, at GOV-172.

Granted, there is a slight discrepancy in the witnesses' testimony with respect to when Downey instructed Robinson to cut Petitioner from the flight. As noted, Downey testified at the hearing that he transmitted the instruction during the 8:13 a.m. call. Tr. 146-47. But Robinson (who did not testify live) has stated (albeit not consistently) that he missed the 8:13 a.m. call and received the instruction when he called Downey back at 9:12 a.m. RX-13, ¶ 6; *see also* PX-14; Tr. 151-52. *But see* PX-13 (interrogatory response from Robinson that he did in fact receive the 8:13 a.m. call). If Robinson was correct when he said that the instruction was transmitted during the 9:12 a.m. call, then Downey's 8:27 a.m. email stating "[h]e has been cut" confirmed an instruction that had not yet been received, let alone carried out.

Naturally, Petitioner makes much of this discrepancy. *See* Pet'r's Summation 3. But I do not. The calls involved were short, so it is hardly surprising that, months later, Downey and Robinson might not remember with precision which call was which. What is important is that they both agree that Downey directed Robinson to cut Petitioner (and Robinson's unimpeached testimony that he then struck Petitioner's name from the list of those to be flown to Honduras). Additionally, whether the critical call was at 8:13 a.m. or 9:12 a.m., the instruction to cut Petitioner came *before* boarding of the plane commenced, at or about 9:13 a.m., RX-38, at GOV-1007, and striking a name from the manifest takes mere seconds, Tr. 140-41, 155. The evidence — contemporaneous records and the testimony — that the instruction to cut Petitioner from the

flight was given *at some point* before the flight departed, indeed before boarding, matters far more than the officers' difficulty in recalling exactly which call was which.

**3. Evidence Concerning the Flight Itself**

Second, contemporaneous records and testimony support the conclusion that Petitioner was not on the flight to and from Honduras. For example, the nursing report for the mission, signed by two flight nurses, reflects that there were 117 detainees, including twelve female detainees, aboard the outbound flight *and* 117 detainees who disembarked in Honduras. RX-30 (noting "117 total PAX" were cleared at ASF and that "117 PAX completed deplaning" in Honduras). Flight nurse Sean Craig recognized his signature on the report and explained both that its information was entered during the mission and that he had reviewed and signed the report to verify its accuracy. Craig Dep. Tr. 32-36, 39, 80-81. He further testified that the count of passengers was taken after the guards physically counted heads on the aircraft and reconciled their count against the manifest. *Id.* at 50-51. Craig interpreted the report's absence of a passenger entry for the return leg to mean that no detainees returned to ASF; he explained that a detainee flown back to ASF from Honduras would have been recorded. *Id.* at 55-58.

Contemporaneous Slack communications regarding the mission support the same conclusion. *See* RX-38. One participant in those communications was Jannie Tucker-Ealy, the lead flight security officer on the mission, who was aboard the aircraft for both the outbound and return trips. *See* ECF No. 156-2, at 11-12 ("Tucker-Ealy Am. Decl."), ¶¶ 5-6 (attesting that she "was aboard [the] removal mission that departed Alexandria, Louisiana (AEX), with a destination in Honduras (MHLM)" and that she was also "personally on the flight from MHLM to AEX"); *see also* RX-30, at GOV-726 (identifying the "ASO Lead" for the mission as Tucker-Ealy); Tucker-Ealy Dep. Tr. 46-47. She confirmed that she used Slack to give "real, live, on-the-

ground updates of what's going on." Tucker-Ealy Dep. Tr. 14-15, 104-05; *see* Tucker-Ealy Am. Decl. ¶ 6 (observing that she "would have known the accuracy of the information in th[e] [Slack] messages at the time [she] sent them"). The messages include:

- A 9:13 a.m. message that the plane was "[i]n process of loading";
- A 9:41 a.m. message that "[a]ll detainees" had been "loaded" and that "property" was "in process";
- A 10:03 a.m. message that ICE was "[i]n process of cutting a Detainees [sic] from air craft [sic]" and that property had been loaded;
- A 10:14 a.m. message reporting "Detainees Manifest 117 w (12 fem)" and that the "Door has closed";
- A 10:20 a.m. message with photographs of the flight manifest, taken on the tarmac, showing Petitioner's name stricken and marked "cut";
- A 10:33 a.m. message indicating that the plane was wheels up with "117(w12 fem)" detainees;
- A 1:18 p.m. message indicating that the plane had landed and opened its door, with "117(w 12 fem )" detainees;
- A 2:54 p.m. message that, at 2:53 p.m., the plane had taken off for ASF and indicating, for detainees, "0 ( 117 offloaded)"; and
- A 5:30 p.m. message indicating that the plane landed in ASF at 5:16 p.m.

RX-38; *see* RX-39, at GOV-1011; Tucker-Ealy Dep. Tr. 108-09; *see also* RX-14, ¶ 10 (Williams attesting that Petitioner was "struck" from the flight manifest as a "no-show"); RX-13, ¶ 8 (Robinson affirming that ICE's electronic database, in which he records "each alien that was released," contained no notation of a release for Petitioner on January 26, 2026).

In her deposition, Tucker-Ealy explained that if a detainee was taken on the plane and then "brought back," that would have been reflected in the Slack messages. Tucker-Ealy Dep. Tr. 104-05, 126. She reported the same in an amended declaration filed in the Second Circuit shortly before the hearing. *See R.R.M.C. v. Blanche*, No. 25-1785 (2d Cir.), ECF No. 87

("Tucker-Ealy Am. Decl."), ¶ 6 (Sept. 10, 2026).[3] She stated unequivocally that no detainees, Petitioner included, "were on the January 26, 2026 flight from [Honduras] to [Alexandria]," and that she knows this "because [she] looked at messages that [she] sent through Slack at or around the time of the mission." *Id.* She explained that it is her practice to send a message whenever a detainee returns on a removal flight, so the absence of any such message in the Slack thread — in her view — means that no detainee was on the flight back from Honduras. *Id.*

Thus, these real-time Slack messages (1) corroborate Gutierres-Amador's testimony about being removed from the plane approximately forty-five minutes after boarding, *see* Tr. 8, 15; (2) corroborate the testimony and evidence discussed above that Petitioner was cut from the manifest *before* the plane departed; and (3) perhaps most significantly, indicate — consistent with the nursing report — that 117 detainees (including twelve female detainees) flew to, and disembarked in, Honduras, and that none flew back to ASF.

**4. Evidence Concerning the Buses and Winn**

Finally, contemporaneous records and testimony corroborate the testimony of Rosales-Ortiz and Gutierres-Amador and indicate that Petitioner returned to Winn on Bus 50 (also known as Bus 53), which departed ASF before the airplane returned from Honduras.

For starters, the paperwork for the bus reflects that all but one of its twenty-five outbound detainees — Rosales-Ortiz — were offloaded at ASF. RX-42, at GOV-1022; RX-45. It further

---

[3] In her first declaration filed in the Second Circuit, four days after the Appointment Order, Tucker-Ealy attested that she knew no detainee had been on the return flight "based upon [her] first hand knowledge as [she] was personally on the flight." *R.R.M.C. v. Blanche*, No. 25-1785 (2d Cir.), ECF No. 68.1, at 8 (Mar. 17, 2026). At her deposition, however, she acknowledged that she did not remember the flight and that she had used "firsthand knowledge" to mean knowledge "[b]ased upon the documentation that [flight officers] can keep." Tucker-Ealy Dep. Tr. 129-30. The Government then filed an amended declaration, explaining that the proposed correction was necessary because "Tucker-Ealy mistakenly understood 'firsthand knowledge' in [her original] declaration." ECF No. 156-1; ECF No. 156-2, at 3, 11-12.

indicates — consistent with the testimony of Rosales-Ortiz and Gutierres-Amador — that two other detainees were added for the return trip, RX-42, at GOV-1022; Powell Dep. Tr. 48, 59-61; that it departed from ASF at approximately 4:35 p.m., forty-one minutes *before* the airplane landed from Honduras, RX-45, at GOV-1030; RX-47; Powell Dep. Tr. 77; and that it arrived back at Winn at about 6:10 p.m., after a return trip that took roughly fifteen minutes longer than the trip from Winn to ASF that morning (consistent with the stop for gas that both Rosales-Ortiz and Gutierres-Amador described), RX-45, at GOV-1030; RX-47. Meanwhile, the paperwork for Bus 47, which took Petitioner and Gutierres-Amador to ASF, indicates not only that it returned to Winn with no detainees but also that Petitioner "return[ed]" on "Bus 53." RX-29, at GOV-716; RX-43, at GOV-1025; RX-46, at GOV-1034; *see* Mathews Dep. Tr. 57-58, 60-61, 68 (explaining that he wrote the "Return Bus 53" notation on the day of the mission, after the Bus 50 crew told him that they had brought Petitioner back).[4]

On top of these records, Winn's count-room log corroborates that transportation officers Martin and Powell returned with three detainees from ASF at 6:10 p.m., RX-32, at GOV-737, and Winn's "daily population movement log" for January 26, 2026, lists scores of detainees

[4] As noted above, Bus 50 was sometimes referred to as Bus 53 — there is no dispute that they are one and the same. *See* RX-53. That said, although not raised by either party, it warrants mention that the two transportation officers on Bus 47, Mathews and Sapp, testified that everyone on their bus got off to board the plane. Mathews Dep. Tr. 62; Sapp Dep. Tr. 47-48. At first glance, that might appear inconsistent with the Government's version of events, in which Petitioner was initially kept on Bus 47 rather than boarding the plane. *See* Gov't PFOF ¶ 45. But Mathews and Sapp indicated that they have no memory of Petitioner and were inferring from common practice and paperwork that recorded their bus returning empty. Mathews Dep. Tr. 38-39, 61; Sapp Dep. Tr. 71. Additionally, Tucker-Ealy, the lead flight security officer on the mission, explained that ICE sometimes "make[s] cuts in . . . the middle of loading," at the aircraft. Tucker-Ealy Dep. Tr. 90-91. It is possible, therefore, that Petitioner disembarked the bus and was cut from the flight while on the tarmac. Regardless, the evidence indicates that, at some point, Petitioner was moved to Bus 50 for the return trip to Winn. *See* RX-29, at GOV-716; RX-43, at GOV-1025; RX-46, at GOV-1034.

transferred to ASF at 2:55 a.m., and only three who returned: Rosales-Ortiz, Gutierres-Amador, and Petitioner, RX-33; *see also* Eleazar Garcia, Jr. Dep. Tr. 91-95, 117-18 (senior warden at Winn confirming that the log indicates three detainees returned). Granted, the latter record does not indicate when the three detainees returned, let alone whether they returned together, but, when considered in connection with the bus records and the count-room log, it allows for only one conclusion: that Rosales-Ortiz, Gutierres-Amador, and Petitioner were the three detainees who returned together with Martin and Powell on the bus that departed ASF at 4:35 p.m., just as Rosales-Ortiz and Gutierres-Amador testified.

**5. Tying All of the Evidence Together**

All of the foregoing evidence supports the conclusions that Petitioner was cut from the removal mission at the last minute; that he did not board the plane; and that he returned to Winn on Bus 50, departing ASF before the plane returned from Honduras. Any one piece of the record might not be sufficient to support that conclusion (although the flight-related records come close). Moreover, the record is not without some inconsistencies. But putting the independent pieces together certainly supports these conclusions by a preponderance of the evidence.

Admittedly, it is noteworthy that the Government did not produce a single official (either here or in the Court of Appeals) who was able to testify to these facts definitively — or, to use the Circuit's words, who had "personal knowledge of Petitioner's location throughout January 26, 2026." App't Order 1. That is, no Government official testified to a specific recollection that Petitioner was not taken onto the plane or was returned to Winn on Bus 50. Instead, one official after the other testified that he or she had no specific recollections of the January 26, 2026 removal mission; could not specifically identify Petitioner; and could not say specifically if he or she saw or spoke to Petitioner on that date. *See, e.g.*, Darrick Brown Dep. Tr. 101-02 (ICE

Air Operations section chief); Craig Dep. Tr. 70; Martin Dep. Tr. 21, 37-38; Mathews Dep. Tr. 38-39; Powell Dep. Tr. 24, 63; Robinson Dep. Tr. 21-22; Sapp Dep. Tr. 26; Tucker-Ealy Dep. Tr. 72. To the extent they testified about the events of January 26, 2026, their testimony was based on their review of the documents discussed above rather than their independent recollections. *See, e.g.*, Mathews Dep. Tr. 38-39; Robinson Dep. Tr. 71; Sapp Dep. Tr. 26, 71; Tucker-Ealy Dep. Tr. 45-46, 72; *see also* Tucker-Ealy Am. Decl. ¶ 6.

But the absence of definitive testimony from these officials is more understandable when considered in context. As Downey testified, deportation officers may be assigned to two flights a day, six days a week, and, thus, may "come into contact with" well over 1,200 detainees in a single work week. Tr. 143. Consistent with that account, Robinson estimated that he sees "[w]ell over 400" detainees per shift. Robinson Dep. Tr. 70. Meanwhile, transportation officers transfer as many as forty detainees per bus, five to seven days a week, *see* Mathews Dep. Tr. 20-21; Powell Dep. Tr. 33, 62; flight nurses can see up to two hundred detainees per flight and typically see each only once, *see* Craig Dep. Tr. 28-29; and an ICE Air Operations section chief schedules "anywhere from 25 to 35 missions a day," Brown Dep. Tr. 15, 36. Given these numbers, it is hardly surprising that no Government official involved in the removal operation on January 26, 2026, was able to remember much about that day specifically, let alone testify that he or she had a specific recollection of Petitioner's whereabouts. As Martin acknowledged, the detainees tended to "blur together." Martin Dep. Tr. 37-38; *see also* Downey Dep. Tr. 53 (explaining that, given the scale of removal operations, "all things can seem to run together").[5]

[5] If anything, the inability of any Government witness involved in the flight to identify or recall Petitioner arguably reinforces that he was not on the flight, as he claims. According to Petitioner, he was the one and only detainee kept on the plane in Honduras and flown back to ASF. *See* Tr. 35-36. It stands to reason that, if that had happened, the officials on the plane would have been more likely to remember and recognize Petitioner.

The scale of removal operations, however, does not explain the Government's failure to produce Winn surveillance footage from January 26, 2026.[6] As noted above, the record contains surveillance footage from January 28, 2026, showing ICE officers visiting and photographing Petitioner in the Winn cellblock. RX-50; RX-51. It stands to reason that similar video was taken on January 26, 2026, and would confirm the time that Petitioner returned to his cell. Yet, the Government failed to produce — or apparently preserve — such video.[7] That failure is hard to fathom, let alone justify, given that the Government was on notice, as of January 26, 2026, that Petitioner was wrongly manifested for removal on that date, *see* RX-17; RX-20, at GOV-91-93; RX-22, at GOV-172, and on notice, as of January 28, 2026, that Petitioner was claiming to have been wrongly removed, *see* RX-08, ¶¶ 4-6. Petitioner understandably emphasizes the Government's failure on this score, *see* Pet'r's Summation 3, and, in the absence of other compelling evidence, I might have too. But given the compelling evidence discussed above, the absence of surveillance footage from January 26, 2026, is not enough to cast doubt on my conclusion that the Government's version of events is the accurate one.

**D. Petitioner's Account Is Not Credible**

Notably, the *only* direct evidence in the record supporting Petitioner's version of events is his own testimony. He also offered, as corroboration, an investigative report prepared by

---

[6] Nor, as discussed below, does it justify the lack of any reliable systems to track the movement of detainees when they are in the process of being removed. To the contrary, it is precisely the scale of these operations that creates the need for such systems.

[7] The record contains a letter from the Government explaining that it "identified only one instance of responsive video footage from January 26 that existed," namely "footage of the buses' entries or exits or both" at ASF from that day, but that such footage "would not have shown anyone in the buses" and, in any event, "was overwritten in the normal course." PX-18, at 3. The record does not appear to contain any explanation for why surveillance footage from Winn is available for January 28, 2026, but not for January 26, 2026.

Nardello & Co. (the "Nardello Report"). But the Nardello Report does not bear the weight that Petitioner puts on it. And for a variety of reasons, I decline to credit Petitioner's testimony.

**1. Petitioner's Testimony**

For starters, there are many reasons to doubt Petitioner's testimony. The first and most obvious is that his testimony conflicts with so much other evidence in the record, including all other direct evidence of what happened on January 26, 2026. Second, and equally notable, is the absence of any witness who corroborates his version of events. On that score, it is significant that Petitioner was given ample opportunity, during the six months of discovery, to identify and obtain records and witnesses supporting his version of events. The absence of such evidence and witnesses is thus striking. Moreover, Petitioner claims that, on or immediately after January 26, 2026, he told at least four people about his version of events: two cellmates, his family, and Mitchell. Tr. 49-50, 94-95. Yet not one of them was called to testify. *See* JPTO 5-8.

Third, Petitioner was repeatedly impeached with his own prior sworn statements. For instance, although he indicated in his written declaration that the plane's seats "were configured in rows of three people on each side," Pet'r's Decl. ¶ 8, he testified at his deposition that each row had two seats per side, RX-63 ("Pet'r's Dep."), at 96. At the hearing, he stood by the declaration, and he suggested that his "memory problems" arose because he was confusing the "enormous plane" he boarded on January 26, 2026, with a different, smaller flight he took in March 2026. Tr. 67-68, 108. Be that as it may, this inconsistency was far from the only one in Petitioner's testimony:

- His declaration stated that the detainees "were not provided with anything to eat or drink" while waiting for ASF to open, but at the hearing he testified that he was offered food and declined it. *Compare* Pet'r's Decl. ¶ 5, *with* Tr. 60-61.

- His declaration stated that he realized on the bus that the plane was going to Honduras, but at the hearing he testified that he did not suspect that it was Honduras-bound until after takeoff. *Compare* Pet'r's Decl. ¶ 6, *with* Tr. 62-64.

- His interrogatory responses and deposition described conversations with seatmates on the plane about topics ranging from their origins to politics, but at the hearing he testified that no one spoke to him beyond "greetings." *Compare* RX-61, at 18-19, *and* Pet'r's Dep. 94-95, *with* Tr. 46, 64.

- His declaration stated that the ICE officers on the plane wore badges that said "civil" and "ICE-ERO," but at the hearing he testified that he "couldn't read the badge[s]." *Compare* Pet'r's Decl. ¶ 12, *with* Tr. 69.

- His declaration stated that he did not "know exactly how long [he was] in the air" and that "it felt like a few hours," but at the hearing he testified that the co-pilot had announced that the flight would take "two hours and 15 minutes." *Compare* Pet'r's Decl. ¶ 9, *with* Tr. 76; *see also* Tr. 34-35 (testifying on direct examination that the outbound flight lasted "two hours, 15 minutes" and that the return flight likewise took "two hours and 15 minutes in the air").

- His declaration stated that, after the other detainees had deplaned in Honduras, he "sat there waiting for about an hour and a half" before asking an ICE officer what was going on, but at the hearing he testified that "it wasn't a long time." *Compare* Pet'r's Decl. ¶ 10, *with* Tr. 77.

- In his deposition, he testified that he remained seated on the plane when he asked why his name had not been called, but at the hearing he testified that he stood up to ask. *Compare* Pet'r's Dep. 128, *with* Tr. 34, 81.

- His declaration stated that he watched an officer strike his name with a red pen, but at the hearing he testified that his name had already been crossed out. *Compare* Pet'r's Decl. ¶ 10, *with* Tr. 78.

- His declaration stated that he could not risk using the bathroom on the bus, but at the hearing he testified that he did use it. *Compare* Pet'r's Decl. ¶ 13, *with* Tr. 89-90.

- His declaration stated that he "did not speak with anyone" on January 27, 2026, but at his deposition he testified that he spoke with his family and Mitchell that day. *Compare* Pet'r's Decl. ¶ 15, *with* Pet'r's Dep. 155-56.

- His deposition stated that the officers' visit occurred on January 30, 2026, in his cell, and that four photographs were taken, but at the hearing he testified that it occurred on January 28, 2026, in the hallway, and that only two photographs were taken. *Compare* Pet'r's Dep. Part II 6, 8, 12, *with* Tr. 50-51, 97.

- In his declaration, he stated that he waited alone on a bus until another flight arrived, while at his deposition he testified that he was moved to a second bus on which three

> detainees were already waiting; at the hearing, he put the number of other detainees at "about four." *Compare* Pet'r's Decl. ¶¶ 13-14, *with* Pet'r's Dep. 143, *and* Tr. 36, 90.

To be sure, any one of these contradictions might be excusable or explainable in isolation. Taken together, however, they cast serious doubt on Petitioner's credibility.

Fourth, several aspects of Petitioner's account seem implausible on their own terms. Most notably, it is difficult to square Petitioner's stated terror at the prospect of returning to Honduras with his conduct throughout the removal mission. Petitioner testified that he feared returning to Honduras because his father had been murdered there and the killers "wanted to take revenge and continue killing other members of the family." Tr. 42, 51. He also testified that he had "suffered physical torture" when he was detained in Honduras after he was wrongly removed there in 2023. Tr. 52. Petitioner claims the fear of returning to Honduras was so severe that he suffered a panic attack on the plane on January 26, 2026. *Id.* at 52. Yet, on his own account, he never told anyone that day that he had a stay of removal that precluded him from being removed. *Id.* at 106-07. When pressed on this point, he responded that he was "ignored" whenever he attempted to speak with an ICE officer. *Id.* at 106. But that fails to explain why, on his own telling, after being told by an officer that Honduras had refused to accept him and that he was going to be flown back to the United States, he responded by volunteering his identification number to prove his Honduran nationality. *Id.* at 34-35, 106-07. No doubt fear can impede one's judgment in myriad ways, but it is hard to fathom why a man who is desperate to avoid returning to Honduras would assert his Honduran bona fides in that situation and not once — over the course of several hours — protest or invoke the court order that forbade his removal.

Nor, for that matter, is there any evidence that Petitioner reported his allegedly wrongful removal to anyone at Winn either — even though, by then, his fears presumably would have subsided enough for him to speak up. *See* Tr. 49-50. Indeed, an opportunity presented itself

immediately, when the officer who processed Petitioner's return greeted him by remarking: "They sent you several times, but they don't deport you." Tr. 49. One might have expected a man who had flown to and from Honduras that day and been removed, in violation of a federal court order, to share what had happened to him. Instead, Petitioner testified that he merely answered "yes," collected his uniform, and went back to his unit. Tr. 49.

Fifth, Petitioner's timeline is inconsistent with undisputed facts in the record. Petitioner testified that, when he boarded the first bus after landing from Honduras, he asked the driver the time and was told it was "around 4:30 or 5." Tr. 36. That testimony is striking in two respects. For one, in sworn interrogatory responses submitted in July — closer in time to the events at issue — Petitioner averred that he had asked the driver the time but could not "reliably recall from memory, five months after the fact, the exact response." RX-61, at 22. For another, the parties stipulated that the only flight from Honduras landed at ASF at 5:16 p.m. Stipulations ¶¶ d, f, h. On his own telling, then, Petitioner was chatting with a bus driver on the Alexandria tarmac *before* the plane he claims to have been on had landed.

Sixth, Petitioner's declaration to the Second Circuit — the document that launched these proceedings — contains a statement that Petitioner now admits to be false. *Compare* Pet'r's Decl. ¶ 3, *with* RX-62, at 8-9. The declaration avers that, after finding his commissary locked, Petitioner "used another person's tablet to send a message" to Mitchell. Pet'r's Decl. ¶ 3. In his third set of amended interrogatory responses, however, Petitioner conceded that this statement "was mistaken" and that the communication "was an oral conversation." RX-62, at 8-9; *see* Tr. 55-57. When asked at the hearing whether he had called Mitchell on a cellphone, which would constitute an admission that he possessed contraband in detention, Petitioner invoked his Fifth Amendment privilege against self-incrimination. Tr. 43, 58. The Government asked me to draw

an adverse inference, Tr. 58, but no inference is needed to arrive at the conclusion that matters here: Petitioner swore under oath to a specific fact that he now admits to be inaccurate.

Seventh, Petitioner's testimony suggests that he provided false statements under oath to a tribunal in Honduras as well. Petitioner acknowledged that, in those foreign proceedings, he was charged with attempted homicide for shooting a man and pleaded guilty to causing severe injury. Tr. 103. Yet he testified that he "never shot anyone" and pleaded guilty only "to take the blame." Tr. 102-04. Petitioner cannot have it both ways: Either his plea in Honduras was false or his testimony at the hearing in this case was. On that front, it is noteworthy that an Immigration Judge twice found that Petitioner had failed to show that the Honduran criminal records had been fabricated. *See* IJ Dec. (Jan. 24, 2022), at 18-20; IJ Dec. (July 5, 2023), at 2, 32-33 (describing the post-remand hearings and reaffirming the earlier finding).[8] In any event, Petitioner's conflicting statements on this matter raise the specter that he has previously lied under oath in court when the stakes were high enough.

Eighth, there is evidence in the record suggesting that Petitioner has lied, or at least provided inaccurate testimony, to other tribunals. Specifically, an Immigration Judge twice concluded that Petitioner was not credible, and the Board of Immigration Appeals sustained the second of these findings. Tr. 105; IJ Dec. (Jan. 24, 2022), at 9; IJ Dec. (July 5, 2023), at 19-28; BIA Decision 1-3. In addition, a different Immigration Judge in 2020 noted "several internal inconsistencies" in Petitioner's testimony, although that Immigration Judge stopped short of making an adverse finding. IJ Dec. (Feb. 20, 2020), at 4-5. Yes, these decisions concerned a

---

[8] The IJ Decisions appear on the Second Circuit docket. *See R.R.M.C. v. Blanche*, No. 25-1785 (2d Cir.) ECF No. 24.12, at 27-51 ("IJ Dec. (Jan. 24, 2022)"); *id.* ECF No. 24.3, at 132-72 ("IJ Dec. (July 5, 2023)"); *id.* ECF No. 24.15, at 203-217 ("IJ Dec. (Feb. 20, 2020)"). For ease of reference, the Court refers herein to the internal pagination of each IJ Decision.

different subject from the one at issue here and, therefore, may be entitled to less weight. Nevertheless, they certainly cast doubt on Petitioner's credibility.

And finally, there is an answer to the natural question of why Petitioner would embellish what happened on January 26, 2026, by claiming that he was not only wrongly slated for removal to Honduras but was, in fact, removed. On that date, Petitioner's lawsuit over his unlawful 2023 removal was still pending, as was his $10 million claim for damages. *See R.R.M.C. v. DHS*, No. 23-CV-7946 (JGLC), ECF No. 55, at 1; 2023 Case Dismissal Stip. 3; Tr. 104; RX-66. On January 30, 2026, just four days after his alleged removal, his counsel emailed the Assistant United States Attorney handling that litigation sharing Petitioner's allegations under the subject line "R.R.M.C. FTCA Claim," RX-66, and that same day the parties first reported to Judge Clarke that they were in settlement discussions, No. 23-CV-7946, ECF No. 55, at 1. Under the terms of the settlement entered on July 23, 2026, ICE released Petitioner to home confinement, and Petitioner released all claims arising from the 2023 removal and 2025 detention, "including any claim under the Federal Tort Claims Act." 2023 Case Dismissal Stip. 3-4; Tr. 41-42, 105. In other words, having been wrongly slated for removal and taken to ASF on January 26, 2026, Petitioner sought to leverage — and did leverage — his claim of unlawful removal to help secure relief that he had been seeking in connection with his 2023 removal.

For all of these reasons, I decline to credit Petitioner's testimony that he was flown to and from Honduras on January 26, 2026.

**2. The Nardello Report**

The only other evidence Petitioner offers is the Nardello Report and the testimony of David Raskin, who led the team that prepared it. *See* PX-02 ("Nardello Rep."). Beginning in July 2026, the Nardello team engaged in outreach efforts that were "focused on identifying

individuals who were on the [f]light [to Honduras] for the purpose of determining if they could identify [R.R.M.C.] as also having been on the flight." *Id.* at 1.

The investigation proceeded in phases. *Id.* at 1-2. In the initial phases, the team obtained a list of the 117 passengers on the January 26, 2026 flight and had investigators in the United States contact seventy-nine of them. *Id.* at 1-2. For that outreach, the Nardello team developed a six-photograph array with a photograph of Petitioner in the second position, in the top-center, alongside five photographs of fillers — other men with similar physical characteristics obtained through reverse-image technology. *Id.* at 2, app. A; Tr. 125; *see* Nardello Rep. 2 (stating that there was no reason to believe any of the five fillers had been aboard the flight to Honduras on January 26, 2026). Of the seventy-nine passengers contacted, sixteen responded, and five viewed the array, but "none of the five recognized" Petitioner. Nardello Rep. 2. Consequently, "Nardello & Co. concluded that the remote phase of the investigation had been exhausted and efforts had to be centralized on the ground, in Honduras." *Id.*

In the next phase, the Nardello team retained investigators in Honduras to locate and interview passengers in person. Tr. 118, 121; Nardello Rep. 3. The Nardello Report states that, "[i]n the course of the photo array procedure conducted by the local investigators, 28 of the Passengers identified [Petitioner] as a person they had seen on the [f]light or afterwards in the Honduras airport." Nardello Rep. 5; *see* Tr. 119. Raskin, who oversaw the investigation, described that result as "[e]xtraordinarily good and reliable." Tr. 119. He testified that he stands behind it "a hundred percent," and he averred that there was "no doubt" in his mind that the respondents had seen Petitioner on the plane. Tr. 121, 133.

I do not doubt that Raskin and his team acted in good faith and certainly do not question the depth and breadth of Raskin's long and impressive service as a federal prosecutor.[9] But I conclude that, upon closer scrutiny, the Nardello Report does not support the weight that Petitioner puts on it — or, more to the point, I conclude that it does not provide much, if any, corroboration for Petitioner's version of events. That is the case for several reasons.

First, the Nardello & Co. investigation did not conform to rigorous standards. By way of example, the Federal Judicial Center's *Reference Manual on Scientific Evidence* describes various practices that make a survey design trustworthy, including interviewers and respondents who are "blind" to the survey's sponsor and purpose; randomized or rotated placement of response choices, so that no option has "an inflated chance of being selected because of its position"; interviewers who record answers verbatim and probe sparingly, to avoid signaling that the respondent has "not yet produced the 'right' answer"; validation of a sample of the interviews; and a report that discloses how many people were contacted, how many could not be reached, how many refused or did not complete the interview, and what the survey's limitations are. *See* 1 Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 709, 717-18, 734-35, 738-39 (4th ed. 2025) ("FJC Reference Manual").

The Nardello & Co. investigation followed few, if any, of these practices. Petitioner's photograph was (and remained) in the top-center position of the array not because of any randomized placement procedure, but rather because a staff member asked Raskin where to put it and he responded: "[W]herever you want." Tr. 125. There were no "double-blind" safeguards, as the interviewers knew that photograph number two was the relevant one and knew Petitioner's

---

[9] As I disclosed to the parties, I previously served in the U.S. Attorney's Office for the Southern District of New York with Raskin and, during that time, worked closely with him on several matters. *See* Tr. 109.

name. Tr. 117-18. Further, the protocol called for the investigators to reveal Petitioner's name to an interviewee if no identification was made, and it instructed them to ask some highly suggestive probing questions before doing so. Tr. 118; PX-03, at 3-4. For example, interviewers were to ask: "Are you sure? We thought you might recognize someone as having been on the flight with you?" and then invite the respondent to "look at the photographs again." PX-03, at 3-4; *see* Tr. 117-18. Nor was any array used without Petitioner's photograph as a control. Tr. 123.

Notably, when asked whether the photo-array process was "scientific," Raskin answered, "I don't know." Tr. 122-23. Raskin was similarly unable to answer other basic questions about the report's methodology. *See* Tr. 122-24. He could not say whether all ninety-one passengers on the contact list given to the Honduran investigators had been reached. Tr. 123. Nor could he specify how many, of those who were reached, identified no one, or how many identified one of the fillers. Tr. 123-24, 125. He conceded that "several" respondents did identify one of the fillers, yet that appears nowhere in the Report, and he declined to agree that the Report would have been more complete with that information. Tr. 125-26.

Second, the Nardello Report contains multiple layers of hearsay. The Nardello team relied heavily on Spanish-language summaries that were written by the local investigators and translated by bilingual staff. Tr. 121-22; Nardello Rep. 5. That process was then "assisted by Google Translate" (for reasons Raskin could not explain). Tr. 122. Thus, the Report is based on the credibility of witnesses that its author never saw firsthand. Tr. 121-22. When pressed, Raskin conceded that the report is "double hearsay," Tr. 126, but, if anything, that is an understatement. Each interviewee spoke to an investigator; that investigator, in turn, wrote a summary; someone else, aided by a computer program (the reliability of which is unclear), then

translated each summary; and using these translations, Raskin then wrote the Report. *See* Nardello Rep. 5; Tr. 121-22. In other words, the Report is triple or even quadruple hearsay.

On top of these causes for concern, many of the reported identifications are inconsistent with Petitioner's own testimony. *Compare* Nardello Rep. 5-9, *with* Tr. 46-47. Passengers 150 and 184 say they spoke with Petitioner upon arrival in San Pedro Sula or "at the SPS airport," and Passenger 150 says Petitioner told him his name. Nardello Rep. 5-6. Passengers 85, 164, and 143 say they heard others call him by name or by a shortened form of his middle name after arrival. Nardello Rep. 6. Passengers 145 and 163 say they saw him in San Pedro Sula, and eleven other respondents say the same, including some who claim that was the "only" place they saw him that day. Nardello Rep. 6-9 (describing Passengers 80, 81, 83, 156, 160, 167, 168, 169, 170, 171, 174 as individuals whose sightings purportedly occurred only in SPS or in a combination of SPS and elsewhere along the voyage). Petitioner, however, swore that he spoke to no one beyond "greetings." Tr. 46. And he claims that no one on the plane knew or used his name (let alone his middle name) and that he never left the plane. Tr. 46-47.[10]

Thus, eighteen of the twenty-eight identifications cannot be squared with Petitioner's own version of events. That leaves ten other respondents who allegedly identified Petitioner's

[10] Raskin suggested that "SPS" might refer to the city of San Pedro Sula rather than its airport. Tr. 128-29. One could take his answer to mean that some respondents might have used the term to refer to their destination generally, much as a traveler might say that he saw a fellow passenger "in New York" after seeing him on a plane that had landed at a New York airport. If so, then reports of seeing Petitioner "only in SPS" would not necessarily be inconsistent with Petitioner's account of landing in Honduras and never leaving the plane. But the language in the Report makes it unlikely that the respondents were describing anything other than encounters on the ground after having disembarked. For instance, they describe speaking with Petitioner "at the SPS airport"; waiting "very close" to him "to give statements to CAMR," the Honduran agency to which the deportees were "handed over" on arrival; and seeing him "only in SPS, not during pre-boarding or on the flight." Nardello Rep. 3, 6, 8. Those are plainly reports of seeing someone who got off the plane, which cannot be squared with Petitioner's testimony.

photograph, but there are reasons to doubt their identifications as well. *See* Nardello Rep. 6, 8-10. Five of the ten are among those who *also* identified a filler. Nardello Rep. 8-10 (Passengers 142, 147, 151, 98, and 89). Raskin himself conceded that "[t]he fact that they also identified somebody who clearly was not on the plane undercuts their reliability of the identification." Tr. 130. Meanwhile, the remaining five expressed their own doubts about their identifications: Passenger 75 "was not very certain"; Passenger 149 "is not certain" because "there were several Garifuna people on the flight"; Passenger 102 saw someone who "closely resembled" Petitioner; and Passenger 91 recognized the photo only "with little certainty." Nardello Rep. 8, 10; Tr. 126. And the last person, Passenger 155, is recorded as having "recognized number two," but only with "some degree of certainty." Nardello Rep. 6.

In short, upon closer scrutiny, the Nardello Report offers less than meets the eye — and certainly does not provide reliable evidence that twenty-eight people identified Petitioner as having been on the plane to Honduras. Given its lack of scientific rigor, its multiple layers of hearsay, and the reasons to doubt each respondent's claim to have seen Petitioner on the flight, I decline to give it much, if any, weight.[11] In the face of the evidence supporting the

---

[11] To be fair, if the Nardello team's identification procedures fell short of rigorous scientific standards, those the Government initially used with Rosales-Ortiz and Gutierres-Amador fell even further short. Each witness was shown a single photograph of Petitioner — as opposed to a photo array — and Gutierres-Amador conceded that he understood the Government was interested in the person depicted. Tr. 22, 26-27, 168; RX-19. Such procedures are suggestive and are often regarded with suspicion. *See, e.g.*, *Manson v. Brathwaite*, 432 U.S. 98, 108-09 (1977). That said, I credit the identifications made by Rosales-Ortiz and Gutierres-Amador notwithstanding the suggestiveness of the procedures used. *See, e.g.*, *Raheem v. Kelly*, 257 F.3d 122, 133, 135 (2d Cir. 2001) (explaining that an identification obtained through a suggestive procedure may still be credited if, under the totality of the circumstances, it is sufficiently reliable). Both men described the other detainee *before* identifying his photograph. Gutierres Dep. Tr. 15-17, 18, 50-51; Rosales Dep. Tr. 31-32, 33-34, 40-41, 42-43. Each spent an extended amount of time on a bus with only two other detainees. Tr. 10-11, 18, 163. Their accounts are, as discussed above, consistent and corroborated by the transportation records tying Petitioner's name to Bus 50's return. RX-46, at GOV-1034; Powell Dep. Tr. 96-101. And, perhaps most

Government's version of events, and the many reasons to doubt Petitioner's testimony, the Report certainly does not provide enough to find, by a preponderance of the evidence, that Petitioner was on the plane.

**E. Taking a Step Back**

In sum, I agree with the Government's version of events and conclude that, on January 26, 2026, Petitioner was *not* on the plane to and from Honduras, as he claims. But the Government's victory on this point should not be an occasion for the Government to celebrate; instead, it should be an occasion for the Government to reflect on its inexcusably poor ability to keep track of the human beings that it is moving in connection with its removal operations.

We live in an age when Amazon and other retailers are able to track packages from warehouse shelf to doorstep, point by point; when Uber Eats and other delivery services are able to provide real-time alerts of every step in the delivery chain; when airlines are able to offer text and in-app updates as luggage is transferred from the holding bin to the carousel; and when anyone is able to track, with stunning precision, almost any item imaginable using devices like an Apple AirTag. Hospitals have adopted technologies to ensure that patients are properly identified in every encounter with medical personnel and that medications are accurately tracked. By contrast, the Government appears to have no system to systematically and reliably keep track of the human beings entangled in its removal system. Given the scale of these operations, it may, as discussed above, be understandable that those involved in them are unable, months later, to recall whether a specific person was or was not on a specific removal mission. But it is

notably, they — unlike the interviewees in the Nardello Report — testified in both a deposition and at a hearing and were subjected to rigorous cross-examination. *See* Tr. 22-28, 166-72; Gutierres Dep. Tr. 50-51; Rosales Dep. Tr. 40-41. Thus, I was able to assess their demeanor and credibility in ways that I was unable to do for the interviewees discussed in the Nardello Report.

shocking that the Government has no reliable system in place to track detainees, provide definitive and unimpeachable information about their movements, and guarantee that those protected by court-ordered stays of removal are not removed or *nearly* removed. The resources wasted on these proceedings, including six months of discovery and a one-day evidentiary hearing, are directly attributable to the lack of such a system. But more to the point, the lack of such a system to monitor the human beings that the Government is detaining and forcibly removing from this country, even if properly, shocks the conscience.

The fact that the Government does not always seek to remove people properly — that its removal operations are far from seamless — makes the lack of such a system even more shameful. It is undisputed that, as of January 2026, the Government was not lawfully permitted to remove Petitioner from this country, *see* RX-10, and that his EARM profile carried a "Stay of Removal" banner as a result, RX-14, ¶ 22. And yet, ICE's scheduling office included him on the list of people to be removed to Honduras on January 26, 2026, RX-52; RX-14, ¶ 4, and, but for the fact that Petitioner (perhaps unlawfully) got immediate word to his lawyer, he likely would have been removed to Honduras — even as he was suing the Government for his concededly improper removal in 2023. Making matters worse, these kinds of errors are far from isolated. Downey testified that scheduling errors of this sort occur roughly once a month, Tr. 152-53, and the record in this case includes emails in which officers express their exasperation about the frequency of such errors and the risks they raise, *see* RX-20, at GOV-91 (email from Williams on January 26, 2026, at 8:22 a.m. stating, "The DOCC scheduled him for removal on 01/22. . . . This crap has got to stop with the DOCC, they really create liability by scheduling anyone and everyone that should not be removed."); *id.* (Davis responding: "To add to that. This would have been the second time this particular detainee was inadvertently removed!!!").

It is the prerogative of the Executive Branch to aggressively enforce the Nation's immigration laws — and nothing in this Opinion should be read to suggest otherwise. But it behooves the Executive Branch to ensure that its enforcement efforts are aided by systems and technology that are equipped for the task. This case makes plain that it is falling short.

**CONCLUSION**

For the foregoing reasons, I recommend that the Court of Appeals find, in answer to the first question posed in its Order of March 13, 2026, that Petitioner was *not* flown to and from Honduras on January 26, 2026, as he has alleged. That leaves the second question, which asks "whether any counsel, party, or declarant has made a knowing and material misrepresentation to the Court in connection with this allegation." App't Order 2. The parties shall promptly confer and, **no later than November 13, 2026**, file a joint letter addressing next steps, including whether any further proceedings are needed to answer that question in light of this Opinion.

The Clerk of Court is directed to transmit a copy of this Opinion and Order to the Clerk of the United States Court of Appeals for the Second Circuit.

SO ORDERED.

Dated: November 4, 2026
New York, New York

JESSE M. FURMAN
United States District Judge and Special Master